# Seafarer's Employment Agreement

("SEA")

| 1. Employer (Owner): SOLEMATES MARINE LTD., C/O Campbells Corporate Services ltd | 2. Employer Address: PO BOX 268, Grand Cayman, KY1 -1104 Cayman Islands |
|---|---|
| 3. Vessel: M/Y SOLEMATES | 4. Seafarer: Linnea Danielle Wexler |
| 5. Date of Birth: | 6. Birthplace: New York, United States |
| 7. Capacity: Sous Chef | 8. Wages: USD $5250 per month |
| 9. Paid Annual Leave: 30 | 10. Remarks: Position temporary until future of vessel known; confirmed through 15 October 2014 |
| 11. Passport Number:<br>Nationality: Sweden<br>Expiration: 28 March 2016 | 12. Employment Start Date/Port: 14 September 2014 La Ciotat, France<br>Home Port for Flight: Florence, Italy |
| 13. Employment End Date/Port (If Known): Unkown | |

1. Employment

   a. The employer named in Box 1 (the "Employer") will employ the Seafarer named in Box 4 (the "Seafarer") on the vessel or vessels named in Box 3 (the "Vessel") for a period commencing on the date or at the port of departure in Box 12 and ending on the date or at the port of destination in Box 13 or until this SEA is terminated in accordance with its terms.





b. The Seafarer will be employed in the capacity Box 7 stated above in ("Capacity"), but may from time to time be required to undertake additional or different duties which may be necessary to meet the needs or requirements of the Employer, and the Seafarer will cooperate in the proper performance of his or her duties and any additional or different duties.

c. The Seafarer will perform, at all times, faithfully, industriously, and to the best of his or her ability, experience, and skill, all of the duties that may reasonably be assigned by the captain, department head, or, if applicable, the Vessel's management company; deal with the property of the Vessel's owner in good faith; and conduct himself or herself at all times during employment in accordance with the highest possible standard of work ethics and professionalism and in a manner appropriate to the trust the Employer has placed in the Seafarer.

d. The Seafarer acknowledges that he or she has read and understands any standing orders of the Vessel that the Employer, captain, or management company has provided to the Seafarer, the terms of which are incorporated into this SEA by reference except in the event of conflict or inconsistency with the terms hereof, in which case this SEA will prevail.

2. **Medical Requirements and Certificate**

a. The Seafarer shall, prior to beginning work on the Vessel, hold a valid medical certificate attesting that he or she is medically fit to perform the duties under the SEA. The medical certificate must be issued by a Cayman Island flag approved body/medical practitioner or, in the case of a certificate solely concerning eyesight, by a person recognized by the



Cayman Island flag as qualified to issue such a certificate. The medical certificate must state that:

i. The hearing and sight of the seafarer concerned, and the color vision in the case of a seafarer to be employed in capacities where fitness for the work to be performed is liable to be affected by defective color vision, are all satisfactory; and

ii. The seafarer concerned is not suffering from any medical condition likely to be aggravated by service at sea or to render the seafarer unfit for such service or to endanger the health of other persons on board.

b. The Seafarer's employment is dependent upon medical examinations to confirm that the Seafarer is fit and able for employment aboard the Vessel. From time to time at the Employer's request and to meet regulatory requirements, the Seafarer agrees to submit to physical examinations and vaccinations by a duly qualified medical practitioner and/or dentist being a Cayman Island flag approved body/ medical practitioner where applicable. The physical examination may include tests for infectious diseases, drug use, and any other tests the Employer deems necessary. The Seafarer is required to furnish medical certificates with respect to such examinations and vaccinations, the delivery of which is a condition precedent to continued employment under this SEA. If the Seafarer fails to pass a physical examination, which determination will be made by the Employer in its sole discretion on the advice of the medical practitioner, the Employer will have the right to terminate this Agreement and the Seafarer's employment. The Employer may require the Seafarer to undergo testing for use of illegal drugs or substances at any time, without notice.



c. All statements made by the Seafarer in connection with physical examinations under this Clause 2 will be deemed representations made pursuant to this SEA, and any misrepresentations by the Seafarer in a statement to an examining medical practitioner will constitute cause for Employer's termination of this SEA and the Seafarer's employment. Failure of the Seafarer to undergo any medical or dental treatments which may have been prescribed in connection with the examinations required under this Clause 2 prior to departure from the port of hire will also constitute cause for termination. Costs for medical examinations required by the Flag of the Vessel will be met by the Employer.

**3. Professional Qualifications and Training**

a. The Seafarer must be trained or certified as competent or otherwise qualified to perform his or her duties. The Seafarer will successfully complete training for personal safety on board a ship prior to commencing work on the Vessel. The Seafarer is required to maintain at the Seafarer's expense any and all professional qualifications required for the capacity in which he or she is engaged.

b. The Seafarer must maintain a current, valid passport and must surrender the passport to the Captain upon request.

c. It is the responsibility of the Seafarer and a requirement of the Seafarer's employment to obtain and maintain a B1/B2 U.S. visitor's visa and any other visa if requested by the Employer or the Captain.

**4. Payment of Wages**

a. The Employer will pay the Seafarer the wages as set forth in Wages – Box 8 (the "Wages") to the account and in accordance with the instructions provided by the Seafarer or such other instructions as the Seafarer may



provide from time to time. While the Employer will make every effort to make the payments promptly, no compensation or interest will be due in the event of a delay. The Seafarer will be responsible for any fees or charges imposed by the Seafarer's bank.

b. The Employer will provide the Seafarer with a monthly account of the payments due and the amounts paid, including wages, additional payments, and the rate of exchange used where payment has been made in a currency or at a rate different from the one agreed to.

c. The Seafarer may elect to allot a proportion of his or her wages to family members by means of bank transfer for remittance at regular intervals. The Shipowner will remit such allotments in due time and directly to the person or persons nominated by the Seafarer. Any charge for this service will be reasonable in amount and the rate or currency exchange shall be at the prevailing market rate or the official published rate and not unfavorable to the Seafarer.

d. The Seafarer will not disclose to or discuss the Wages with any member of the Vessel's crew, other than the captain.

5. Payment of Taxes

a. If and to the extent the Employer has an obligation to withhold taxes from the Wages, the Employer may do so. In any event, the Seafarer remains liable to account for and pay any and all taxes and social security charges in respect of the Wages or employment related benefits that may be required to be paid in or by any jurisdiction beyond taxes withheld and remitted by the Employer.



b. If the Seafarer claims any exemption or exclusion from tax with respect to the Wages, the Seafarer must provide to the Employer any necessary proof and documentation required to claim such exemption or exclusion.

6. Living Conditions

a. The Seafarer will be provided with decent living conditions on board the ship as required by the Maritime Labor Convention, 2006. The Seafarer will be responsible for the tidiness and regular cleaning of his or her living quarters.

7. Health and Social Security Benefits

a. The Employer will bear the cost of medical treatment of the Seafarer occurring between the date of commencement of duty and the date upon which the Seafarer is deemed repatriated, or arising from the Seafarer's employment between those dates, for a period of up to 16 weeks after the Seafarer is deemed to be repatriated.

b. Where a sickness or injury results in incapacity for work, the Employer will pay full wages for up to 16 weeks after the onset of sickness or the occurrence of the injury until the Seafarer's recovery, provided that the liability of the Employer to pay wages in whole or in part is limited to 16 weeks from the day of the injury or the commencement of the sickness. Whilst the amount paid by the Employer may be reduced by the amount of any payments the seafarer is entitled to from their own social security system the Employer will pay any difference to ensure the seafarer gets 100% of his basic wages for the minimum 16 weeks.

c. The Employer will compensate the Seafarer in the event of death or long-term disability due to an occupational injury, illness or hazard, as set out in the Crew Health Insurance policy.



d. The Employer will defray the expense of medical care, including medical and emergency dental treatment and the supply of the necessary medicines and therapeutic appliances, and board and lodging away from home until the sick or injured Seafarer has recovered, or until the sickness or incapacity has been declared of a permanent character, provided that the Employer will not be liable for such expenses in so far as such liability is assumed by the public authorities.

e. The Seafarer will be provided with any medical care on board should that become necessary, free of charge, including access to necessary medicines, medical equipment and facilities for diagnosis and treatment and medical information and expertise. Where practicable and appropriate, the Seafarer will be given leave to visit a qualified medical doctor or dentist in ports of call for the purpose of obtaining treatment.

f. The Employer will have no liability in respect of:

   i. Injury incurred whilst taking part in aeronautics or aviation other than as a passenger, hunting, diving (unless PADI or equivalent diving qualification holder), skiing or any form of winter sports (except curling or non-competitive skating), potholing, caving, mountaineering (ordinarily necessitating the use of ropes or guides), speed or time trials or racing of any kind other than on foot;

   ii. Injury or sickness due to the willful misconduct of the Seafarer;

   iii. Sickness or infirmity intentionally concealed when the employment is entered into.

g. The Employer will pay the cost of burial expenses in the case of death occurring on board or ashore during the period of engagement.



h. The Seafarer will report all injuries or illnesses to the Employer immediately. If the Seafarer must leave the Vessel due to illness or accident for hospitalization or repatriation, he or she agrees to consult a physician appointed by the Employer for examination and report on the results thereof to the Employer if so required.

8. **Hours of Work and Rest**

a. Subject to the terms of this Clause 8, the Seafarer will be required to work at such times and for such periods as are necessary for the efficient discharge of the Seafarer's duties, at sea or in port. In this regard, the Seafarer will be required to comply with the directions of the captain or the Seafarer's department head.

b. The Seafarer's maximum hours of work will not exceed 14 hours in any 24-hour period and 72 hours in any seven-day period.

c. The Seafarer's minimum hours of rest will not be less than 10 hours in any 24-hour period and 77 hours in any seven-day period.

d. Hours of rest may be divided into no more than two periods, one of which will be at least six hours in length, and the interval between consecutive periods of rest will not exceed 14 hours.

e. When the Seafarer is on call, the Seafarer will have an adequate compensatory rest period if the normal period of rest is disturbed by call-outs to work.

f. The Seafarer and the Vessel's captain will endorse records of the Seafarers' hours of work and rest, which records will be in English and presented to the Seafarer as endorsed.



g. Nothing in this Clause will be deemed to impair the right of the captain to require the Seafarer to perform any hours of work necessary for the immediate safety of the ship, persons on board or cargo, or for the purpose of giving assistance to other ships or persons in distress at sea. Accordingly, the master may suspend the schedule of hours of work or hours of rest and require the Seafarer to perform any hours of work necessary until the normal situation has been restored. As soon as practicable after the normal situation has been restored, the captain shall ensure that the Seafarer, if he or she has performed work in a scheduled rest period, is provided with an adequate period of rest.

9. Paid Annual Leave

a. The Seafarer will be entitled to take the number of working days stated in box 9 Leave ("Paid Annual Leave") as leave in each year of employment, during which the Seafarer will be paid normal wages. Paid Annual Leave will accrue at the rate of one twelfth of the annual entitlement per month.

b. All Paid Annual Leave must be taken in the year in which it accrues. The Seafarer may not elect to receive payment in lieu of untaken Paid Annual Leave. However, if on termination of employment Paid Annual Leave has accrued but has not yet been taken, then the Seafarer will receive payment in lieu of any untaken Paid Annual Leave at the date of termination. Any leave taken in excess of the Seafarer's entitlement to Paid Annual Leave will be deducted from the final payment due at termination.

c. For periods of employment of less than one year, entitlement to Paid Annual Leave will be assessed pro rata.



d. Paid Annual Leave will be scheduled subject to the operating requirements and schedule of the Vessel.

e. If the Seafarer works on a rotating or other non-full time basis, the Seafarer's leave entitlement will be calculated pro rata based on actual days worked.

f. Public holidays are consolidated into the Seafarer's leave/salary.

10. Repatriation – The Seafarer will be entitled to repatriation in the following circumstances:

a. If the Seafarers' employment agreement expires while he or she is abroad or one ticket every 12 months;

b. When the SEA is terminated.

c. When the Seafarer is no longer able to carry out his or her duties under this SEA or in the event of illness or injury or other medical condition requiring your repatriation, in the event that the ship is proceeding to a Warlike Operations Area or the event of termination or interruption of employment in accordance with an industrial award or collective agreement.

d. Shipwreck.

e. Insolvency of the shipowner, sale of the ship, change of flag or a similar reason.

Where repatriation is required the Seafarer will be entitled to overland travel or the cost of flights (at economy class) from the terminal or airport nearest to the port at which the Seafarer's employment is terminated to the Seafarer's place of residence, or port of hire, at the Company's option, provided that the Employer may recover the cost of repatriation from the Seafarer's wages or other entitlements, to a maximum



of $1000, if the Seafarer has been found to be in serious default of his or her employment obligations.

11. Termination

a. The Company may terminate the seafarer's employment at any time upon seven (7) days notice and the Seafarer may terminate the employment by giving seven (7) days notice. A notice period shorter than the minimum may be given in circumstances justifying termination of the SEA at shorter notice or without notice, including misconduct of the Seafarer as prescribed in the Code of Conduct provided or the Seafarer's need to terminate the SEA for compassionate or other urgent reasons, or if in the opinion of the Master your continued employment would be likely to endanger the vessel or any person onboard.

b. The Employer may give payment in lieu of notice required under Clause 11(a).

c. Any luggage or other possessions left on board will be kept on board until written instructions of the Seafarer are received, provided that these instructions are received within sixty days of termination; after sixty days, the Employer will be entitled to dispose of the luggage and possessions as it sees fit.

d. Upon termination of this SEA for any reason, the Seafarer will promptly return all keys, equipment, films, photographs, tapes, models, documents, issued uniforms, and other material of whatever nature, whether originals or copies, including all digital files, relating to the Vessel, the Employer, or the Vessel's owner.

e. Should the vessel be wrecked, lost, or foundered and your employment is terminated before the date indicated in Box 13 or notice given in



accordance with Clause 11(a) of this Agreement, as appropriate, you will be paid the greater of either two months' salary or your notice period.

f. In the event of termination due to the vessel's sale, you will be given notice in accordance with Clause 11(a) or pay in lieu of notice to the extent that the notice given is less than the contractual notice period

**12. Complaint Procedure**

a. The Seafarer will follow the Employer's Seafarer's Complaint Procedure, a copy of which will be provided to the Seafarer before signing this SEA, if requested, and in any event, will be made available on board the vessel.

**13. Confidential Information**

a. The Seafarer acknowledges that by reason of his or her duties and position he or she will obtain confidential and proprietary information of a special and unique nature and value affecting and relating to the Employer and the Vessel's owner, including the employees, officers, directors, and beneficial owner(s) thereof, and any entities relating thereto ("Confidential Information"). The Seafarer acknowledges that all Confidential Information is the exclusive property of the Employer and the Vessel's owner, is material and confidential, and greatly affects the business of the Employer and the Vessel's owner. Accordingly, the Seafarer hereby covenants and agrees that he or she will use the Confidential Information only for the benefit of the Employer and the Vessel's owner, and that he or she will not at any time directly or indirectly, either during the term of this SEA or thereafter, divulge, reveal, or communicate any Confidential Information to any person, firm, corporation or entity whatsoever, or use any Confidential Information for the Seafarer's own benefit or for the benefit of others. The Seafarer will execute and be bound by a separate nondisclosure


agreement, which is attached hereto (the "Non-Disclosure Agreement"). This Clause 13 and the Non-Disclosure Agreement will survive the termination of this SEA.

**14. Compensation in respect of loss of personal property as a result of the loss or foundering of the vessel**

a. Where you lose personal property, as a result of the vessel on which you are serving foundering or being lost, the Shipowner will pay compensation up to a maximum of $1000.

**15. Disciplinary Rules and Procedure**

a. The disciplinary rules applicable to you are set out in the Code of Conduct for the Merchant Navy, which has been agreed between the UK's Chamber of Shipping, Nautilus UK and the National Union of Rail, Maritime and Transport Workers, or the Shipowner's Code of Conduct. The Code of Conduct will be made available to you, if so requested, before you sign this agreement. If you are dissatisfied with any disciplinary decision taken in relation to you, you should refer to the disciplinary procedure set out in the Code of Conduct, which may be obtained from the Master.

**16. Governing Law**

a. This SEA will be governed by and construed in accordance with the laws of the Vessel's flag state. The courts of the Cayman Islands will have jurisdiction to determine any disputes which arise out of or in connection with this SEA, and each of the parties hereto hereby submits to the jurisdiction of such courts and waives any right he, she, or it may have to trial by jury.

*17. Opportunity to Review SEA and Seek Counsel*

a. The Seafarer hereby acknowledges that he or she has had an opportunity to review and seek advice on the terms and conditions of this SEA and has freely entered into this SEA with a sufficient understanding of his or her rights and responsibilities hereunder.

IN WITNESS WHEREOF, the Employer and the Seafarer have executed this Seafarer's Employment Agreement as of the date and at the place set forth below.

| Employer: SOLEMATES MARINE LTD., CAPTIAN - AS MANAGER AND AGENTS FOR AND ON BEHALF OF THE EMPLOYER | Seafarer: Linnea Wexler |
|---|---|
| Date: 22 September 2014 | Date: 22 September 2014 |
| Place: La Ciotat, Frabce | Place: La Ciotat, France |



## Non-Disclosure Agreement

I have agreed to be employed pursuant to a Seafarer's Employment Agreement with Dream Holdings LTD (the "Employer") aboard the vessel M/Y Dream (the "Vessel") and I understand that in the course of this employment, I am likely to obtain information, correspondence, history, gossip, stories, rumors, photos, data, and other information not generally known by or available to the general public relating to and concerning the Employer or the Protected Parties (collectively, the "Confidential Information"). For purposes of this Non-Disclosure Agreement, the term "Protected Parties" mean, collectively, the beneficial owners of the Employer and their family, friends, guests, business associates, visitors and charterers, and any other entities related to the Employer.

I acknowledge that the reputations of the Employer and the Protected Parties are critical to the professional and financial success of the Employer and the Protected Parties, that dissemination of the Confidential Information could be harmful to and cause serious personal and financial damage to the Employer and the Protected Parties, and that my employment is conditioned upon my agreeing to the terms of this Non-Disclosure Agreement.

Consequently, I agree that I will keep the Confidential Information confidential and will not disclose it to anyone. Further, I will conduct my business and personal affairs in such a manner as to minimize the possibility of causing scandal or undue embarrassment to the Employer or the Protected Parties. I further agree not to publish

any books or articles, make a posting to any web site, give interviews, appear on media productions, or give Confidential Information to anyone, whether during or after the employment.

I acknowledge and agree that this Non-Disclosure Agreement is intended for the benefit of and enforceable by the Employer and the Protected Parties. I recognize that in the event of my breach of this Non-Disclosure Agreement or in the event my breach may be reasonably anticipated, there would be irreparable harm to the Employer or the Protected Parties for which there would be no adequate remedy at law, and I therefore agree that the Employer or the Protected Parties may seek injunctive relief and such other remedies (including without limitation recovery of attorneys' fees incurred in pursuing remedies and enforcing this Agreement) that may be available to them in law or equity. This Agreement shall supplement any employment, service, consulting, or other agreement I may have with a beneficial owner or company owned by a beneficial owner, and I understand and agree that breach of this Non-Disclosure Agreement shall be grounds for terminating all such other agreements.

I acknowledge, represent and warrant that I have received a copy of this Non-Disclosure Agreement, that I have read and fully understand this Non-Disclosure Agreement, that I have had the opportunity to seek the advice of legal counsel before signing this Non-Disclosure Agreement and the opportunity to negotiate any or all of its terms and that I have either consulted with counsel or voluntarily decided not to do so and that I have either negotiated the terms of this Non-Disclosure Agreement or have voluntarily decided not to do so. This Non-Disclosure Agreement shall be construed as if the Employer and I had jointly prepared it, and any uncertainty or ambiguity shall not be interpreted against any one party.

Employment for any reason whatsoever. In the event that any one or more provisions contained in this Non-Disclosure Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Non-Disclosure Agreement.

The waiver of any breach, act, omission, term, covenant or condition of this Non-Disclosure Agreement shall not be effective unless in writing and signed by the Employer and shall not, in any event, be deemed a waiver of any other or subsequent breach, act, omission, term, covenant or condition.

This Agreement will be binding upon me and my heirs, fiduciaries, successors and assigns, and shall be governed by the laws of the Vessel's flag state without giving effect to the choice or conflict of laws principles thereof. I consent to the jurisdiction of the courts of the Vessel's flag state, and I waive any right I may have to trial by jury.

| Employer: SOLEMATE MARINE LTD.,<br>CAPTAIN - AS MANAGER AND AGENTS FOR AND ON BEHALF OF THE EMPLOYER | Seafarer: Linnea Wexler |
|---|---|
| Date: 22 September 2014 | Date: 22 September 2014 |
| Place: La Ciotat, France | Place: La Ciotat, France |